[No. D048456. Fourth Dist., Div. One. May 8, 2008.]

THE PEOPLE, Plaintiff and Respondent, v.
PARAKKAMANNIL KOSHY BILJI VARGHESE, Defendant and Appellant.

COUNSEL

George L. Schraer for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Jeffrey J. Koch, Gil Gonzalez and Lynne McGinnis, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**BENKE, Acting P. J.**—Parakkamannil Koshy Bilji Varghese was convicted of first degree murder with a true finding he used a deadly weapon within the meaning of Penal Code[1] section 12022, subdivision (b)(1). He was sentenced to a prison term of 26 years to life. Varghese appeals, arguing the trial court erred in refusing to allow independent DNA testing of a bloodstain and that the trial court erred in refusing to suppress certain evidence.

FACTS

A. *Prosecution Case*

1. *Events Prior to the Murder*

In April 2003 appellant and his wife Vilia Varghese (Vilia) were having marital problems. Appellant believed Vilia was having an affair. Vilia reported

---

[1] All further statutory references are to the Penal Code unless otherwise specified.

to the police that appellant assaulted her and she moved out of the family home. Appellant admitted striking her but stated it was an accident.

Haval Ravin was a physician who ran a fertility clinic. He was divorced and lived with his 17-year-old-son Rizgar R. He had parties at his home and hired Middle Eastern dancers to entertain. Vilia worked as one of the dancers. Eventually, the two began a relationship and Vilia spent three to four nights a week at Ravin's house.

Appellant was unhappy with his separation from Vilia and did not want a divorce. After the separation, he was depressed and angry. Appellant stated he did not like Ravin. Appellant sat in his car outside Ravin's home or drove by the house slowly. On one occasion when Vilia drove up to Ravin's house, appellant got out of his car, approached her, held her car door so she could not get out, and argued with her. On other occasions appellant stood on the street in front of Ravin's house and simply looked at it.

Appellant is a large muscular person who is an expert in several martial arts, including swordsmanship. As part of his training as a sword fighter, he was taught to attack certain vital parts of an opponent's body. At a karate tournament, appellant talked about Ravin and stated: "I could just kill that guy."

### 2. *The Murder*

On November 11, 2004, Ravin was home with Rizgar. Vilia was not there but Ravin talked with her by phone. He told a joke and laughed. After the call, Ravin prepared for bed. At approximately 10:00 p.m. Rizgar drove to his mother's house.

Colin Huntemer lived in the house immediately behind Ravin's. At approximately 11:30 p.m. on November 11, 2004, he heard a man screaming very loudly three or four times from the area of Ravin's home. The screaming stopped, there was no more noise, and Huntemer went to sleep.

Around 2:15 a.m. Rizgar returned to his father's house. He noticed that both the inside lights and outside porch lights were on, as well as the garage and kitchen lights. This was unusual. As Rizgar walked to the front door, he noticed a large amount of blood on the walkway and stairs leading to the door. Believing something bad had happened, he walked away from the house. As he did so, he saw the silhouette of a person through a window. The person was well built like appellant. As Rizgar watched, the outside lights on the house flickered several times and then all of the lights went out. Rizgar called his father but got no answer. He then called the police.

Officers arrived at the house at approximately 2:20 a.m. As they walked to the house, they noticed a large trail of blood leading to the front door. Opening the door with keys supplied by Rizgar, they smelled a strong odor of bleach. There were bloody swirl marks on the floor tiles as if someone had attempted to clean up the blood. Two sets of shoe prints in blood were visible in the front entryway. One pattern was from Adidas sneakers and the second was a waffle-pattern. A criminalist later concluded the evidence indicated a third person was present during the bloodshed or during the cleanup.

Blood was found in many locations in the house. A bottle of bleach and a hand vacuum cleaner were on the floor. The sliding glass door to the rear of the house was open.

Ravin died from multiple stab wounds. One wound to the neck severed his jugular vein and penetrated his spine. There were multiple wounds to the abdomen, one of which severed the iliac artery. There were other wounds to the back, a bicep and the testicles. There were other smaller cuts and abrasions on the body.

The officers found a size 10½ man's Paolo Mondo dress shoe that belonged to appellant in the foliage near the rear fence of the Ravin home. Ravin's blood was on the shoe. Semen was found on the inside of the shoe with DNA that matched appellant's. The sole of the shoe matched the waffle-pattern bloody shoe print found in the house. Also near the fence, the officers found two blankets with the victim's blood on them.

A blood spot was found near a light switch in the house. A DNA analysis of the blood indicated the chance of its being from someone other than appellant was in the quintillions.

Appellant and Vilia's divorce became final on November 23, 2004.

### 3. *Investigation*

At approximately 9:45 p.m. on November 12, 2004, officers searched appellant's residence. When appellant opened the door, the officers smelled a very strong odor of bleach. There was also an odor of bleach on appellant's hands. Appellant had a cut on the middle finger of his right hand. He had several scratches, bruises and abrasions on his hands, forearm and neck. Appellant was wearing size 10 tennis shoes. He normally wore size 10 or size 10½ shoes.

A bag with a spot of appellant's blood was found in his house. The officers found a receipt for Shout stain remover purchased at 11:20 a.m. on November 12, 2004, and a receipt showing appellant purchased bleach at 8:14 p.m. on November 12, 2004.

The front seat floormats were missing from appellant's car. The car was recently cleaned and had a strong odor of carpet cleaner. A can of Tuff Stuff spot and stain remover was found in the trunk. In a briefcase in the car was a black book containing various phone numbers, including Ravin's home and cell phone numbers.

A laptop computer was found in the car. The computer was used to conduct numerous name searches for "Vilia" and "Haval" and for photographs of Vilia and Haval. Searches were also conducted for "Rizgar" and Ravin's other children. Searches were conducted for fertility center Web sites. A search was done for the term "Revenge+Bagavad Gita." Several searches were conducted for "Revenge," "Adultery" and "Law."

### B. *Defense*

The defense theory was that Vilia and an accomplice killed Ravin. There was evidence Vilia's relationship with Ravin had become difficult. There was evidence Vilia feared Ravin would not marry her and that he might become interested in another woman. A drinking glass, apparently recently used, was found at Ravin's house bearing Vilia's DNA.

### DISCUSSION

### A. *Testing of Blood Sample*

Appellant argues the trial court erred when it denied his request to conduct confidential DNA testing on what remained of a bloodstain found at the murder scene which earlier testing had indicated was his blood.

### 1. *Background*

Evidence item 19 was a small bloodstain found near a light switch at the murder scene. The sample was important because prosecution DNA testing established the blood was appellant's.

By pretrial motion appellant asked that his expert be allowed to independently test item 19. Appellant asked his expert be under no obligation to reveal the results of that testing to the prosecution. Appellant conceded his testing might consume what remained of item 19.

The prosecution opposed the motion. It stated that it wished to conduct further testing on the sample and would be unable to do so if appellant's motion was granted. It suggested a neutral expert or appellant's expert test

the remains of item 19 but the results of that testing be provided to both the prosecution and the defense.

At a hearing on the motion, appellant noted the prosecution tested a portion of item 19 and obtained a result. Appellant argued there was no need for the prosecution to do additional testing and that, based on his constitutional right to counsel, the defense should be allowed to conduct an independent test of the remaining portion of the item without obligation to reveal its results.

The prosecution replied that given the importance of item 19, it wished to corroborate the DNA results obtained by the police criminalist. It argued that, because additional testing would consume the remaining sample, it was a reasonable compromise to allow additional testing by either a neutral expert or the defense expert with the results being supplied to both parties.

While he could not say with certainty, the police DNA expert who tested a portion of item 19 testified it was a "reasonable assumption" that an additional test would consume the sample.

The trial court found there was a risk that additional testing would consume item 19. The court concluded the prosecution was entitled to corroborate its findings with regard to an important item of evidence. Given those circumstances, the trial court accepted the prosecution compromise and ruled the defense could conduct additional tests on item 19 but required the result be provided to the prosecution.

Appellant filed a motion asking the trial court to reconsider its ruling and order the remains of the sample turned over to the defense for testing without the obligation to report the results of the testing to the prosecution. By declaration defense counsel noted after the court's ruling the prosecution sent item 19 to an independent laboratory for testing. Counsel indicated that after talking to experts, it was counsel's opinion the testing proposed by the independent laboratory would consume the remaining portion of item 19.

At a hearing on the motion to reconsider, defense counsel stated it was unclear whether a test of the remaining portion of item 19 would consume the sample, and indeed stated it was unclear if there was enough material left to allow a result at all. The laboratory to which the prosecution sent the sample stated that its testing would use the remainder of item 19. Defense counsel stated that "in an abundance of caution" he concluded the sample could not be divided for further testing.

The prosecutor confirmed the laboratory to which the sample was sent for corroborative testing believed the test would consume the remainder of item

19. The prosecutor stated the laboratory believed its testing would provide a result. The prosecutor stated it offered to have the testing done by the defense expert on the condition the results be provided to both parties, but the defense declined the offer.

The trial court stated it was willing to issue an order to allow the defense expert or any independent laboratory agreeable to the defense to test item 19, but only if the results were made available to both parties.

The defense declined the offer.

2. *Discussion*

a. *Law*

Appellant contends this court's opinion in *Prince v. Superior Court* (1992) 8 Cal.App.4th 1176 [10 Cal.Rptr.2d 855] supports his claim that while a DNA test of item 19 would in all probability consume the remainder of the small sample, his right to counsel required the trial court allow him to conduct that test without a requirement he report its results to the prosecution. We disagree.

In *Prince* the subject sample was large enough to allow each party to conduct five DNA tests. The trial court divided the sample between the parties but ordered that each party could observe a test conducted by the other and be provided a report of the results. Prince sought relief from this court, arguing on several bases that the prosecution should not be allowed to observe the defense testing and was not entitled to a report of test results. (*Prince v. Superior Court, supra*, 8 Cal.App.4th at pp. 1178–1179.)

We held the trial court's order, under the circumstances, violated Prince's constitutional right to the effective assistance of counsel. More specifically, we concluded the order unnecessarily interfered with counsel's right to communicate in confidence with experts in the preparation of the defense case. We were guided by the principle that "[w]hile it is true the goal of the judicial process is to find the truth, allowing the defense to conduct an independent test of the DNA will not unfairly prejudice the People or result in injustice." (*Prince v. Superior Court, supra*, 8 Cal.App.4th at p. 1180.) We supported this conclusion by citing several factors, in particular that the prosecution would have other samples for additional testing.

*Prince* is distinguishable from the present case. Here, while the prosecution had conducted DNA testing on item 19, the remainder of the sample was insufficient to allow additional testing by both parties. It was impossible to

both allow the prosecution to conduct a test to confirm its initial result—a reasonable action in light of the importance of the sample and the certainty the defense would attack the prosecution's testing—and also for appellant to conduct a confidential test in preparation of the defense.

Respondent argues this case is controlled by *People v. Cooper* (1991) 53 Cal.3d 771 [281 Cal.Rptr. 90, 809 P.2d 865]. That case, however, is distinguishable as well. In *Cooper* several small drops of blood were found at the crime scene. The drops were so small a single test would consume them. Nonetheless, the defense, citing the right against self-incrimination and the right to counsel, sought the samples for confidential testing. The prosecution objected, arguing the samples be jointly tested by the parties or that a defense expert be allowed to test the samples in the presence of the prosecution's expert. The trial court denied the defense request for confidential testing. (*Id.* at pp. 814–815.)

The court in *Cooper* concluded the trial court acted properly. The court stated: "Under these facts, the defendant has no right to obtain the evidence collected by the prosecution, to destroy that evidence in independent testing, and then to withhold from the prosecution the results of the testing." (*People v. Cooper, supra*, 53 Cal.3d at p. 815.)

*Cooper* is distinguishable from the present case because in *Cooper* the entire sample would be consumed in a single test.

b. *Application of the Law*

■ We can view the applicable cases as existing along a spectrum. At one end of the spectrum are those cases where there exists only one sample, which sample will be used up in its entirety in a single test. Case law is clear and the parties here do not dispute that in such a situation the defense has no right to test the sample independently, although the better practice is to offer the defense the ability to be present at the testing. This principle is consistent with our Supreme Court's holding in another context, that the prosecution is not required to preserve evidence, and thus there is no due process violation, where it is necessary to consume the available evidence in order to test it, or test it properly. (*People v. Griffin* (1988) 46 Cal.3d 1011, 1019–1023 [251 Cal.Rptr. 643, 761 P.2d 103], and cases cited therein.)

The underlying rationale of *Cooper* is that because the blood samples were very small, they could not be divided so as to give the defendant a portion, and under those facts, "the defendant has no right to obtain the evidence collected by the prosecution, to destroy that evidence in independent testing, and then to withhold from the prosecution the results of the testing." (*People v.*

*Cooper, supra,* 53 Cal.3d at p. 815.) Quoting *People v. Meredith* (1981) 29 Cal.3d 682, 694 [175 Cal.Rptr. 612, 631 P.2d 46], the Supreme Court in *Cooper* noted that when defense counsel alters or removes physical evidence, he " 'necessarily deprives the prosecution of the opportunity to observe that evidence in its original condition . . . . [T]o bar admission of testimony concerning the original condition and location of the evidence in such a case permits the defense in effect to "destroy" critical information . . . .' [Citation.] [¶] Just as there was no defense right in *Meredith* . . . to destroy evidence it found before the prosecution found it, so too there is no defense right to destroy evidence found by the prosecution." (*Cooper,* at p. 815.) The Supreme Court affirmed the trial court's order that all of the blood samples be tested in the presence of both the defense and prosecution.

In *People v. Bolden* (2002) 29 Cal.4th 515 [127 Cal.Rptr.2d 802, 58 P.3d 931] our Supreme Court added to the *Cooper* analysis. In *Bolden* there was not a sufficient quantity of material for separate testing by the defense and prosecution. Experts from both sides were allowed to be present at a single joint test. Importantly, the defense expert agreed he would not divulge his conclusions or reports to the prosecution. However, the defense challenged the procedures used. The prosecution was permitted to call the defense expert as a percipient witness for purposes of a *Kelly* hearing (*People v. Kelly* (1976) 17 Cal.3d 24 [130 Cal.Rptr. 144, 549 P.2d 1240]) on the question of what the defense witness observed and notated. (*Bolden,* at p. 552.) The court concluded that when the defendant challenged the prosecution's expert, a substantial need arose for the prosecution to corroborate its expert. The only available mechanism to accomplish that was to call the only other percipient witness to the procedures, i.e., the defense expert who was present. (*Ibid.*) Allowing this did not violate the defendant's rights to federal and state due process or his right to the effective assistance of counsel.

■ At the other extreme end of the spectrum is the situation where there are multiple pieces of evidence sufficient enough to allow multiple testing by each of the parties. This was the case in *Prince.* On such facts, the findings and investigation of a defense expert may not be subject to prosecution discovery. (*Prince v. Superior Court, supra,* 8 Cal.App.4th at p. 1180, cited with approval in *Alford v. Superior Court* (2003) 29 Cal.4th 1033, 1046 [130 Cal.Rptr.2d 672, 63 P.3d 228].) As our Supreme Court noted in *Bolden, supra,* 29 Cal.4th at page 552, the rationale of this court's opinion in *Prince* rested on the possibility of the multiple testing available *to each party.* As the court in *Bolden* observed, if the defense tests revealed a match to the defendant, the defense would not likely present its expert's finding at trial. The case would proceed with the prosecution's multiple testing. If, however, the defense testing excluded the defendant, the expert would surely testify and the prosecution would have the identity of the expert, the expert's report, and

multiple tests of its own with which to rebut the defense expert. Thus the prosecution was not prejudiced in the presentation of its case.

■ We have a situation somewhere along the spectrum. Here, the evidence was divided into two samples, each of which could be tested only once. One sample was used up by the People. The question is whether the trial court erred in ordering that the remaining sample could be tested by an independent expert or an expert of defendant's choice but requiring defendant to reveal the bottom-line result of the test, that is, whether the testing identified defendant or not. We conclude on the facts here the trial court acted within its discretion.

No authority decides the precise question before us. However, as the examination of existing cases reflects, established factors guide the choices available to the trial court. Whatever choice it selects must ultimately support the orderly and accepted process of trial and support the integrity underlying the advocacy process. The opportunity for the prosecution to adequately meet a defendant's challenge to its expert and the expert's findings is an important component of the choice to be made. Indeed, that component appears to underlie all of the cases, including our decision in *Prince*.

In light of these observations, the function of the second sample becomes important because it must protect and serve the needs of both the prosecution and defense, and at the same time its use must not subvert the truth-finding role of the criminal justice process. This is a weighty task. Viewed in this light, the second test should permit the defense to scrutinize the evidence to assure the prosecution test is proper and correct. At the same time, it cannot be given over to the defense, destroyed through its testing procedures, thereby leaving it unusable as corroboration if at trial the defense challenges the prosecution's testing.

Here, at the prosecutor's suggestion, the trial judge gave the defense the option of selecting a neutral expert or its own expert. It did not order the reports or observations of the expert be turned over to the prosecution. It ordered only the result of the test to be revealed. In doing so, the court granted defendant the right to test the results and keep all of its work product and reports confidential. At the same time it foreclosed the possibility that a test result matching that of the prosecution's expert would be destroyed and the People left without the ability to corroborate its findings if the defense were to challenge at trial the prosecution expert.

We note the trial court and parties might have reached other compromises that meet the principles established by case law. We conclude only that the

option selected here protected the interests of both parties and advanced the interest of determining the truth. It reflected an acceptable exercise of discretion.

### B. *Search of Appellant's Computer*

Appellant argues the trial court erred in refusing to suppress evidence found on his computer. Appellant contends the initial seizure of the computer was improper because it was not listed as an item subject to seizure in the original search warrant, and in any event the later warrant authorizing search of the contents of the computer was not supported by probable cause.

As respondent notes, while appellant moved to suppress evidence seized pursuant to the warrants, the issues advanced below were not those presented on appeal. The parties disagree about the effect of this incongruity. Respondent argues the issues are waived; appellant prefers the term "forfeited." Appellant argues his motions to suppress were sufficient to preserve the issues now advanced on appeal because they raise only issues of law.

We think respondent has the better of this controversy. By appellant's own admission, even if the computer was not listed as an item to be seized under the first warrant, it could be seized if the police had probable cause to believe it was related to the crime. (*People v. Bradford* (1997) 15 Cal.4th 1229, 1289–1290 [65 Cal.Rptr.2d 145, 939 P.2d 259].) Because no argument was raised concerning the failure to list the computer in the warrant, the prosecution had no opportunity to provide this alternative basis for its lawful seizure. More fundamentally, it is important for a variety of reasons that parties be encouraged to raise issues at the first opportunity.

Of course, any waiver discussion is of limited importance because the failure to raise an issue at trial may result in a claim of ineffective assistance of counsel. In many instances that claim necessitates us to review the merits of the underlying issue. We will do so here.

The standard of review on a motion to suppress is well established. We defer to the trial court's express or implied factual findings if supported by substantial evidence. We, however, apply constitutional principles to the trial court's findings or, when the facts are undisputed, to independently determine the legality of the search. (*People v. Glaser* (1995) 11 Cal.4th 354, 362 [45 Cal.Rptr.2d 425, 902 P.2d 729]; *People v. Balint* (2006) 138 Cal.App.4th 200, 205 [41 Cal.Rptr.3d 211].)

### 1. *Background*

#### a. *Warrants and Searches*

At 11:20 p.m. on November 12, 2004, the day Ravin's body was found, the police applied by telephone for a search warrant for appellant's residence and for his car parked in front of the residence. The affiant officer described a list of items to be seized, including "papers, documents and effects which tend to show dominion and control over said premises, including keys, photographs, tape voice and/or images, computer tapes and disks, pagers, anything bearing a person's name, photograph, or social security number, or driver's license number, or form of identification."

The officer related the discovery of Ravin's body and the investigation of the crime. The officer noted that Ravin's children stated their father was dating Vilia. They remarked that Vilia's ex-husband, appellant, was stalking her and coming by their father's home. Vilia told the officers her ex-husband was very jealous and might have killed Ravin. She stated she recently received e-mails from appellant concerning child custody issues.

The affidavit noted the victim suffered multiple stab wounds. It noted Vilia reported appellant was an expert at karate and was an expert swordsman.

The officer noted he was calling from inside appellant's house. Officers went to the location to speak with him. When appellant opened the door, the officers smelled a strong odor of bleach and noted there was bleach at the crime scene and indications of an attempt to clean up the area.

The magistrate issued the warrant.

During the search of appellant's vehicle, the officers found a notebook-style computer.

On March 11, 2005, the police sought a search warrant to examine the contents of the hard drive on the laptop computer seized from appellant's car. The information sought included e-mail activity, news articles concerning homicide, information regarding travel to Mexico and the hiring of a person to kill, information concerning the victim and his family and information regarding weapons.

The affidavit for the warrant related the circumstances of the murder of Ravin. It stated and gave reasons for concluding that two persons were involved in the killing. The affidavit also stated and gave reasons for concluding appellant had a motive for killing Ravin based on Vilia's affair

with Ravin. It noted that testing indicated blood found at the crime scene was appellant's and blood found at appellant's home was Ravin's.

The affidavit related a drinking glass found at the crime scene was tested and revealed the presence of both Ravin's and Vilia's DNA. Vilia's fingerprint was also found on the glass. The affidavit provided reasons to believe the glass was used shortly before the murder.

The affidavit related that Vilia told officers she had several recent e-mails from appellant concerning their divorce proceeding. She noted one e-mail she believed was sent after the murder that requested in the event appellant died or became incapacitated for any reasons his brother should have custody of his son. The affidavit noted Vilia was a suspect in the crime and that e-mail messages between the two could provide information useful to the investigation.

The affidavit noted that on March 4, 2005, the police received an anonymous e-mail, stating that prior to the murder appellant mentioned he was thinking of hiring someone in Mexico to kill Ravin. The affidavit noted appellant might have used his laptop computer to obtain information about hiring someone to kill Ravin or regarding travel to Mexico. The affiant officer also noted that based on prior investigations it was common for persons to access the Internet to obtain information about others, including their address and financial background. He noted it was also common for persons to access the Internet to research and purchase weapons. The officer hoped information on the computer might help identify other suspects and establish whether Vilia was involved in the crime.

The warrant was issued. An examination of the laptop revealed it was used to conduct various types of searches concerning Vilia and Haval and for their photographs. Searches were conducted concerning Ravin's children and about fertility clinics. There were searches concerning healing marriages and about revenge and adultery. E-mails were found between appellant and Vilia concerning their divorce.

b. *Motions to Suppress*

Appellant filed a first motion to suppress, arguing the warrant for his house was issued without probable cause and was overly broad. He stated the affidavit not only failed to supply probable cause but that no officer could reasonably believe it supplied probable cause. Appellant also argued the warrant was overly broad in that it allowed the search of broad categories of items, e.g., "anything bearing a person's name, photograph or social security number." Appellant additionally argued no officer could reasonably believe the warrant was sufficiently circumscribed.

Appellant filed a supplemental motion to suppress. This motion first added a claim that the affiant officer had misled the magistrate in seeking the warrant and that all items seized in his residence and vehicle should on that basis be suppressed. Appellant noted an important part of the probable cause for issuing the warrant was the officer's statement the victim's children reported appellant was stalking his wife and came by the victim's house. The affidavit reported the victim's son stated that in the past six months he saw appellant parked on the block where his father's house was located and driving by the house. The victim's son reported that on one occasion appellant stopped and talked to Vilia in the driveway of his father's house.

Defense counsel attached a declaration to the motion, stating he reviewed the video and tape recordings of the police interviews of the victim's children. In those interviews the victim's son states he saw appellant talking to Vilia more than a year before the murder. In the interview the victim's son states that Vilia told him appellant had "pretty much stopped" any conduct directed at Vilia and "he's realized we're over." Counsel's declaration also noted that while another of the victim's children stated appellant was stalking Vilia, no basis for that knowledge was given. The victim's remaining child provided no information concerning appellant stalking Vilia.

The supplemental motion also asked that the laptop computer and any data found on it also be suppressed. Appellant argued there was no basis provided in the affidavit for a search of appellant's vehicle.

Appellant also argued in the supplemental motion that any information found on the computer be suppressed as "fruit of the poison tree" because it was seized as a result of the two unlawful search warrants.

The prosecution replied the affidavit was accurate. The prosecution argued there was probable cause to allow a search of appellant's vehicle, to seize the laptop computer and to search it. The prosecution argued the affiant was acting in good faith.

At a hearing on the motion, defense counsel argued the claims made in his motion and supplemental motion to suppress.

The trial court denied the motions. The court found there was probable cause for the search of the house and car. The court found the affiant did not intentionally mislead the magistrate with regard to evidence concerning stalking and that, even if the evidence concerning stalking was excised from the affidavit, there remained sufficient probable cause to issue the warrant. The court found there was probable cause, under the circumstances, to allow a search of appellant's vehicle.

## 2. *Seizure of the Computer*

Appellant argues seizure of his computer was unlawful because it was not listed in the warrant as an item subject to seizure. He rejects the position the computer could be seized pursuant to the warrant's authorization for the seizure of items showing dominion and control of the premises searched. He contends reading the warrant so broadly would mean it allowed an unlawful general search that lacked sufficient particularity in its description of items to be seized. (See generally *People v. Superior Court (Nasmeh)* (2007) 151 Cal.App.4th 85, 94–96 [59 Cal.Rptr.3d 633].)

### a. *People v. Balint*

Appellant notes that in *People v. Balint, supra,* 138 Cal.App.4th 200 the court concluded a computer, unmentioned in a warrant, was properly seized pursuant to the warrant's authorization to seize items showing dominion and control. Appellant argues the case was wrongly decided and in any event is distinguishable.

In *Balint* an investigation revealed a man was involved in the recent theft of credit cards. Officers had reason to believe the man and Balint lived together. A search warrant was issued for their residence. The warrant authorized a search for items related to the theft of the credit cards and also for a Toshiba laptop computer that was also stolen. The warrant additionally authorized the seizure of items tending to show dominion and control of the residence but did not state that a computer was such an item. (*People v. Balint, supra,* 138 Cal.App.4th at pp. 203–204.)

During the search, a Compaq brand laptop computer that was open and sitting on a sofa was seized. Balint moved to suppress the computer, arguing it was not listed as an item subject to seizure under the warrant. The prosecution countered that data ordinarily contained on a computer includes information identifying its owners, such information would help establish dominion and control of the premises and, thus, seizure of the computer was authorized by the warrant. (*People v. Balint, supra,* 138 Cal.App.4th at pp. 204–205.)

█ In resolving the issue, the court began by noting the Constitution requires a warrant to describe with particularity the items to be seized. This insures a person's belongings will not be subject to " 'a general, exploratory rummaging.' " (*People v. Balint, supra,* 138 Cal.App.4th at p. 206.)

█ The court noted that dominion and control clauses are a standard feature of search warrants. They are justified by the need to link persons to

incriminating evidence found in the place searched. The court noted such clauses have repeatedly been found lawful, e.g., *People v. Alcala* (1992) 4 Cal.4th 742, 799–800 [15 Cal.Rptr.2d 432, 842 P.2d 1192]. (*People v. Balint, supra*, 138 Cal.App.4th at p. 206.)

■ In *Balint* the court noted the defendant did not claim the dominion and control clause lacked sufficient particularity. Rather, she argued the failure to list computers among the items in the dominion and control clause evidenced a decision by the issuing magistrate that a laptop computer would not provide evidence of dominion and control of the place searched. The court disagreed. It noted the scope of a warrant is determined by its language interpreted objectively and reasonably by the officers who serve it. (*People v. Balint, supra*, 138 Cal.App.4th at p. 207.)

■ The court stated that language allowing a search for evidence of dominion and control is necessarily general because of the numerous and varied items that can provide such evidence. It would be impossible to list in advance every possible item that could reasonably provide evidence of dominion and control. Likewise, given the nature of such evidence, dominion and control clauses allow the opening of a large variety of items that can hold such materials. (*People v. Balint, supra*, 138 Cal.App.4th at pp. 207–208.)

In discussing whether a particular seizure exceeds the reasonable scope of the language of a warrant, the court noted it was lawful under a warrant to seize items that are "similar to" or the "functional equivalent" of, items specifically enumerated in the warrant as well as the containers in which they can be found. (*People v. Balint, supra*, 138 Cal.App.4th at p. 208.) Citing the Colorado Supreme Court's opinion in *People v. Gall* (Colo. 2001) 30 P.3d 145, 153–154, the court noted a computer is a "container" which holds items and information similar to, and the functional equivalent of, the specific items listed in dominion and control clauses. (*People v. Balint, supra*, 138 Cal.App.4th at pp. 208–209.)

The court stated: "In sum, under the circumstances present here, we conclude an open laptop computer is likely to serve as a container of information tending to establish dominion and control of the residence in which it is found." (*People v. Balint, supra*, 138 Cal.App.4th at p. 210.)

b. *Analysis*

As appellant acknowledges, while the issue raised by the defendant in *Balint* did not deal directly with the question of whether a computer, not specifically mentioned in a warrant, may, nonetheless, be seized under a general dominion and control clause, it resolved that issue. We agree with *Balint* and conclude it controls the present case.

■ Appellant's objection to *Balint* begins with his position that general dominion and control clauses in warrants unconstitutionally allow for unlawful and insufficiently particularized searches. As noted, however, our Supreme Court has concluded such clauses are proper. While it is true dominion and control can be demonstrated by a host of items, and while the nature of those items allows for relatively broad searches, establishing dominion and control of a place where incriminating evidence is found is reasonable and appropriate. (*People v. Alcala, supra,* 4 Cal.4th at pp. 799–800; *People v. Nicolaus* (1991) 54 Cal.3d 551, 574–575 [286 Cal.Rptr. 628, 817 P.2d 893].)

■ Appellant argues that even assuming dominion and control clauses are proper, they do not and should not authorize the seizure of computers because of the wide range and types of personal information that may be stored on them. Appellant argues computers may contain large amounts of personal information having nothing to do with the dominion and control of the place searched. *Balint* rejects this argument because computers in general are routinely used to store information relevant to the issue of dominion and control. The court concluded a computer is the functional equivalent of a filing cabinet and · a reasonable place to seek information concerning the dominion and control of the place searched. (See *People v. Gall, supra,* 30 P.3d at pp. 153–154; *Commonwealth v. McDermott* (2007) 448 Mass. 750 [864 N.E.2d 471].)

Appellant argues even if *Balint* was correctly decided, its facts are distinguishable from the present case. We disagree. We first note that here, unlike *Balint,* the dominion and control clause of the warrant authorized the seizure of "computer tapes and disks." The warrant, thus, specifically authorized the seizure of materials stored by computers.

Appellant argues *Balint* was a theft case in which a computer was stolen. He notes *Balint*'s observation that evidence of dominion and control of a premises where stolen property is found tends to aid in the conviction of the guilty party. He observes that in the present case the crime was not theft but murder and that linking appellant to the residence to be searched was not, in his view, important to solving the crime. In any event he argues here there was no serious question concerning the dominion and control of the place to be searched.

The search warrant for appellant's case was sought within hours of the discovery of the murder. Unavoidably, much was unknown or unclear at that early point in the investigation. Because the officers believed evidence concerning the murder could be found at a location which they believed was appellant's residence, they were entitled to secure items at the location relevant to more clearly establish his dominion and control.

Appellant also notes that in *Balint* the court found it significant the computer was open when found. The court noted this was important because it suggested the computer was not merely being stored at the location but was used there and contained information concerning who had dominion and control of the premises.

It is true the computer in this case was found closed and in appellant's car parked outside the house. Nonetheless, the computer was a portable one designed to be moved and used in different locations. Given its discovery in appellant's car outside the residence, it was reasonable to conclude the computer was one used by appellant and might contain information relevant to his control of the residence.

### 3. *Search Warrant for the Computer*

Appellant argues that even if the computer was properly seized pursuant to the first warrant, there was no probable cause supporting the second warrant allowing search of the computer itself. Essentially, appellant argues the reasons given by the affiant officer to support a finding of probable cause were conclusory and based on the uncorroborated statement of an anonymous informant.

### a. *Law*

A search warrant must be supported by probable cause. (U.S. Const., 4th Amend.; § 1525.) In determining whether probable cause exists, the magistrate considers the totality of the circumstances. (*Illinois v. Gates* (1983) 462 U.S. 213, 238 [76 L.Ed.2d 527, 103 S.Ct. 2317].) "Probable cause, unlike the fact itself, may be shown by evidence that would not be competent at trial. [Citation.] Accordingly, information and belief alone may support the issuance of search warrants, which require probable cause. [Citations.]" (*Humphrey v. Appellate Division* (2002) 29 Cal.4th 569, 573 [127 Cal.Rptr.2d 645, 58 P.3d 476].)

Because they are often written by nonlawyers in the midst of an investigation, technical requirements for elaborate specificity have no place in the review of search warrant affidavits. (*United States v. Ventresca* (1965) 380 U.S. 102, 108 [13 L.Ed.2d 684, 85 S.Ct. 741]; *People v. Ulloa* (2002) 101 Cal.App.4th 1000, 1006 [124 Cal.Rptr.2d 799].)

A magistrate may reasonably rely on the special experience and expertise of the affiant officer in considering whether probable cause exists. (*People v. Tuadles* (1992) 7 Cal.App.4th 1777, 1784–1785 [9 Cal.Rptr.2d 780].)

While, in a particular case it may be difficult to determine when an affidavit demonstrates the existence of probable cause, the resolution of doubtful or marginal cases should be largely determined by the preference to be accorded to warrants. (*People v. Weiss* (1999) 20 Cal.4th 1073, 1082–1083 [86 Cal.Rptr.2d 337, 978 P.2d 1257].)

A court reviewing the issuance of a search warrant defers to the magistrate's finding of probable cause unless the warrant is invalid as a matter of law. (See *People v. Thuss* (2003) 107 Cal.App.4th 221, 235 [133 Cal.Rptr.2d 149].) The duty of the reviewing court is to ensure there was a substantial basis for the magistrate concluding there was probable cause to issue the warrant. (*Illinois v. Gates, supra*, 462 U.S. at pp. 238–239.)

b. *Affidavit*

The affiant officer asked for a warrant to search the notebook computer found in appellant's car. He asked to search the device for e-mail addresses, e-mail communications, profile information, billing records, news articles regarding homicides that occurred before or after the murder under investigation, information regarding travel to Mexico, information regarding hiring a person to commit murder, any information concerning the victim's business, downloaded photographs and advertisements concerning knives, swords, guns or other items usable as weapons.

The affiant noted his extensive experience as a police officer and homicide detective and his experience with computer or Internet-related crimes. He reviewed in detail information concerning the discovery of the victim's body. The officer noted several facts that suggested two people might have been involved in the murder, e.g., the discovery of two distinct and unidentified shoe prints at the crime scene.

The affiant noted the victim died from five stab wounds. One of the wounds was to the victim's testicles, which indicated to the officer the crime might have been one of "passion."

The officer noted the victim was having an affair with Vilia at a time she was still married to appellant. The officer noted Vilia discussed her relationship with both, saying she was not sure whom she wanted to be with, essentially creating a "love triangle." Vilia told officers appellant was jealous of the victim.

Vilia told the officers appellant was an expert swordsman and practiced martial arts.

The affidavit reviewed in detail the evidence seized from appellant's residence.

The affiant officer noted appellant's blood was found at the crime scene.

The officer also detailed several items of evidence leading him to conclude Vilia was the second person involved in the murder.

The officer noted Vilia told the officer about several recent e-mails received from appellant and noted the two corresponded via e-mail regarding their divorce.

The officer noted the police recently received an anonymous e-mail, stating: *"Regarding the murder of Haval RAVIN, prior to the murder, [appellant] mentioned that he would hire or mentioned he was thinking of hiring someone from Mexico to kill Dr. Ravin. Could this be the second person?"*

The officer stated based on his experience it is common for persons to access the Internet to get information about others and to research and purchase weapons such as knives, swords and guns. The officer also noted appellant and Vilia had corresponded by e-mail, and because Vilia was a suspect in the case, it was important to review the correspondence between the two.

   c. *Analysis*

There was a substantial basis for the magistrate to issue the warrant for the search of appellant's computer. Certainly, the anonymous, uncorroborated statement that appellant had mentioned the possibility of hiring someone from Mexico to kill Ravin was not particularly useful. However, it was also a minor part of the affidavit and there is nothing to suggest the magistrate relied on it.

Of greater importance was the information concerning the e-mail correspondence between appellant and Vilia. It was reasonable to believe appellant used the computer found in his car to conduct that correspondence. The correspondence was important in two possible ways. First, if appellant was jealous of Vilia's relationship with Ravin, it provided a motive for the murder. The correspondence might contain evidence of appellant's state of mind. Second, as the affidavit noted, Vilia was a suspect. Again, an exchange of messages between her and appellant might provide evidence of her complicity in the crime.

The affiant officer also noted that based on his experience persons often use the Internet to gather information concerning other persons. The police were led to believe appellant was jealous of Vilia's relationship with Ravin. To corroborate that fact and to strengthen a case that the murder was a crime of passion, it was reasonable to search the computer for evidence appellant had researched Ravin. Indeed, that is what the search revealed.

There was probable cause to issue a warrant for a search of appellant's computer.

The judgment is affirmed.

McDonald, J., and Irion, J., concurred.

A petition for a rehearing was denied June 4, 2008, and appellant's petition for review by the Supreme Court was denied August 20, 2008, S164434.